IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Ricky E. Brown, ) | Civil Action No. 6:14-4486-DCN-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Carolyn W. Colvin, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for disability insurance benefits under Title II of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed an application for disability insurance benefits ("DIB") on August 13, 2008, alleging that he became unable to work on July 19, 2006. The application was denied initially and on reconsideration by the Social Security Administration. On December 7, 2009, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Kathleen H. Robbins, an impartial vocational expert, appeared on August 23, 2010, considered the case de novo and, on September 30, 2010, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended (Tr. 18-29). The ALJ's finding became the final decision of the Commissioner of Social Security

when the Appeals Council denied the plaintiff's request for review on May 10, 2011. The plaintiff then appealed the ALJ's decision in this court and obtained an order of remand on July 24, 2012 (Tr. 517-47, 548-49). *See Brown v. Astrue*, C.A. No. 6:11-1500-MBS-KFM, 2012 WL 3029654 (D.S.C. June 29, 2012), *report and recommendation adopted by*, 2012 WL 3029652 (D.S.C. July 24, 2012). Upon remand, the Appeals Council directed the ALJ to:

> Evaluate and consider the objective evidence from Mr. Adams' assessment of the plaintiff's ability to perform fine manipulation with his hands and fingers.
>
> Reevaluate the prior finding regarding the weight given the opinion of Dr. Tollison in light of the newly produced evidence.
>
> Evaluate and weigh the newly produced evidence from Drs. Worsham and Tollison and to reevaluate and weigh the prior opinions of vocational evaluator Mr. Adams and Dr. Tollison.
>
> Should the ALJ's analysis upon remand continue to Step 5 of the sequential evaluation, obtain additional vocational expert testimony and provide the expert with proper hypothetical questions setting out all of the plaintiff's impairments.

(Tr. 550-52, 517-47, 548-49).

On May 29, 2013, the plaintiff and Alfred Jonas, an impartial medical expert, and Karl S. Weldon, an impartial vocational expert, appeared[1] at a hearing before the same ALJ in Greenville, South Carolina. On February 20, 2014, the ALJ issued a decision finding that the plaintiff was not under a disability as defined in the Social Security Act, as amended (Tr. 417-41). The ALJ's decision became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on September 30, 2014 (Tr. 389-92). The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

---

[1]Dr. Jonas appeared via telephone.

1.  The claimant last met the insured status requirements of the Social Security Act on June 30, 2011.

2.  The claimant did not engage in substantial gainful activity during the period from his alleged onset date of July 19, 2006, through his date last insured of June 30, 2011 (20 C.F.R. § 404.1571 *et seq.*).

3.  Through the date last insured, the claimant had the following severe impairments:  degenerative disc disease of the lumbar and cervical spine (polyarthritis), degenerative joint disease of the hips and right shoulder, depression, anxiety, dysthymic disorder, somatoform disorder (20 C.F.R. § 404.1520(c)).

4.  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

5.  After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) except, the claimant can occasionally lift or carry 10 pounds, frequently lift or carry 10 pounds, stand 2 of 8 hours, walk 2 of 8 hours and sit 6 of 8 hours.  The claimant can frequently climb, occasionally climb ladders, ropes, scaffolds, balance, stoop, kneel, crouch and crawl.  He can frequently push and pull with his lower extremities.  He can frequently handle, finger, and reach overhead.  The claimant should avoid moderate exposure to hazards.  He can only perform simple 1-2 step tasks.  The claimant can have occasional public contact.

6.  Through the date last insured, the claimant was unable to perform any past relevant work (20 C.F.R. § 404.1565).

7.  The claimant was born on February 10, 1964, and was 47 years old, which is defined as a younger individual age 45-49, on the date last insured (20 C.F.R. § 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404. Subpart P, Appendix 2).

10.  Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in

3

the national economy that the claimant could have performed (20 C.F.R. §§ 404.1569, and 404.1569(a)).

11.  The claimant was not under a disability, as defined in the Social Security Act, at any time from July 19, 2006, the alleged onset date, through June 30, 2011, the date last insured (20 C.F.R. § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment.  20 C.F.R. § 404.1520.  If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually

performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments that prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there

is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 42 years old on his alleged disability onset date (July 19, 2006) and was 47 years old on his date last insured (June 30, 2011). He completed the eighth grade and later obtained a GED and an associate's degree in industrial mechanics (Tr. 453-54). The plaintiff has past relevant work experience as a millwright and maintenance worker (Tr. 440).

### *Medical Evidence*

On July 24, 2006, the plaintiff complained to Sidarth Patel, M.D., of lower back and left leg pain and numbness of the left foot, left shoulder pain, and numbness in the fingers of his left hand. Dr. Patel found the plaintiff had a slow, antalgic gait and mild tenderness in the lumbar region. He diagnosed sciatica and suspected cervical radiculopathy or shoulder disease with regard to the plaintiff's shoulder and hand symptoms (Tr. 323).

The plaintiff presented at the Anderson Area Medical Center on August 1, 2006, with a chief complaint of right hip pain. He reported that he was injured on July 19, 2006, while using a heavy drill and had since been unable to work (Tr. 248). Lewis M. Jones, M.D., noted that an MRI of the plaintiff's spine showed "chronic degenerative changes with disc present" but no large disc extrusion. Dr. Jones diagnosed "work-related back, hip pain with disk disease" (Tr. 249-51). X-rays of the plaintiff's left shoulder were reported as negative (Tr. 254).

On October 6, 2006, Michael T. Grier, M.D., a pain management specialist, examined the plaintiff. Dr. Grier noted that, compared to a 2001 MRI of the lumbar spine, the plaintiff's August 2006 MRI showed a slight increase in spondylosis, facet arthritis, and

disc bulging. Dr. Grier found that the plaintiff had a "fairly typical" radicular pain pattern and prescribed epidural steroid injections (Tr. 289-90).

On February 27, 2007, Dr. Grier noted the plaintiff had cancelled his epidural steroid injection appointment and had no specific treatment since October 2006. Dr. Grier found the plaintiff had an essentially normal gait with only a minimally antalgic component, normal mental status, and intact memory. After the plaintiff again declined epidural steroid injections, Dr. Grier prescribed pain medication (Gabapentin). In March 2007, the plaintiff reported little relief from Gabapentin and complained of side effects. Dr. Grier changed his medication and again found his gait was essentially normal. In April 2007, Dr. Greer found the plaintiff's gait was "modestly antalgic" and that he had good strength, no motor or sensory deficits, and normal mental status. Dr. Grier adjusted his medication regimen because of the plaintiff's report of side effects (Tr. 285-88).

In May 2007, the plaintiff complained of increased pain in his back and legs when standing for longer than ten minutes. Dr. Grier found he had a markedly antalgic gait and some giveaway weakness in the right leg. Dr. Grier refused the plaintiff's request for narcotic medication and prescribed Relafen and Baclofen (Tr. 283-84). In July 2007, Dr. Grier found the plaintiff had a modestly antalgic gait with good strength and no particular limp, intact memory, and no major signs of a mental disorder (Tr. 281).

On June 13, 2007, Dr. Patel examined the plaintiff and reviewed his MRI report. The plaintiff reported no improvement with pain treatment and complained of pain after 15-20 minutes of standing. Dr. Patel's examination revealed a mild, right-sided limp and minimal tenderness in the lumbar region. Dr. Patel diagnosed low back pain/sciatica and stated: "In my opinion he can do sedentary sit down job if available" (Tr. 299).

In July 2007, Marion R. McMillan, M.D., of Foothills Pain and Anesthesia Associates, examined the plaintiff and found he had an antalgic gait, a positive straight leg raising test on the right, absent ankle reflexes, and abnormal sensation in the right calf. Dr.

7

McMillan diagnosed a far-right lateral disc herniation at L4-5 with right lumbar neuralgia and recommended microdiscectomy surgery. Dr. McMillan noted, ""MRI examination documents far right lateral disc herniation and foraminal compression of nerve root L4-5, anatomically appropriate to explain symptoms" (Tr. 244-45).

On August 3, 2007, Dr. Grier noted that he had been recommending epidural steroid injections to the plaintiff "all along" but the plaintiff continued to refuse them and that the plaintiff had tried various medications without dramatic relief of pain. He also noted that the plaintiff was scheduled to see Dr. Worsham as a primary care provider. Dr. Grier prescribed Percocet at the plaintiff's request, but noted he would not provide that medication on a long-term basis. Dr. Grier further noted that the plaintiff asked if he was a candidate for a percutaneous disc decompression. Dr. Grier told him that he would ask Dr. Loudermilk, but the plaintiff would need to fail a trial of epidural steroids first (Tr. 280).

The plaintiff saw Stephen F. Worsham, M.D., as a new patient on August 14, 2007. The plaintiff related that nothing had helped him but narcotic pain medication, "hinting at Oxycontin, Percocet, Lortab." Dr. Worsham ordered x-rays and prescribed Klonopin, Ultram, and Neurontin (Tr. 297). X-rays of the plaintiff's hips showed mild to moderate degenerative joint disease in the right hip and mild degenerative joint disease in the left (Tr. 253). X-ray of the left shoulder was negative showing no arthritic change (Tr. 254). Two weeks later, the plaintiff reported that he had strained his shoulder, hip, and back while crawling under a truck and working on the engine. Dr. Worsham adjusted his medications and noted that Klonopin had worked well for the plaintiff's "anxiety disorder" (Tr. 296).

The plaintiff underwent epidural steroid injections on August 22 and September 12, 2007 (Tr. 276-79). On October 10, 2007, the plaintiff reported that his hips and thighs felt much better but complained of pain and numbness in his lower legs. Dr. Grier's examination revealed a modest antalgic gait with no particular limp, good strength,

8

and no major signs of a mental disorder. Dr. Grier prescribed Robaxin for muscle spasm in the great toe and refilled his prescription for Percocet (Tr. 274).

On October 23, 2007, Dr. Worsham noted that pain management had helped the plaintiff "tremendously" and that he was currently doing well. Dr. Worsham noted the plaintiff had insomnia and planned to "[c]ontinue on current regimen of medications for . . . insomnia" (Tr. 295). On January 7, 2008, Dr. Worsham noted that he was treating the plaintiff for "anxiety disorder, depression, and hyperlipidemia." He noted that the plaintiff had "a lot of tearful periods" and prescribed Valium and Celexa (Tr. 294).

In November and December 2007 and February 2008, Dr. Grier noted that the plaintiff had no side effects from his medications and was stable on his current regimen (Tr. 268, 272-73).

On April 1, 2008, Dr. Grier found that the plaintiff had a modest antalgic gait with no particular limp, good strength, and normal mental status. The plaintiff complained of increasing neck pain with radicular symptoms in the left arm and hand. Dr. Grier ordered an MRI of the cervical spine, which showed no evidence of disc herniation (Tr. 266, 269).

On April 23, 2008, Dr. Worsham saw the plaintiff "after prolonged absence" and refilled his prescriptions for Valium (for anxiety) and Ambien (for assisted sleep) (Tr. 293).

On May 30, 2008, Dr. Grier found the plaintiff had normal gait and good strength in all extremities except for some weakness in the left upper extremity and normal mental status. On July 29, 2008, Dr. Grier found the plaintiff had a modestly antalgic gait with no limp and was otherwise neurologically intact. Dr. Grier's current diagnoses were lumbar disc disease and radiculopathy, status post epidural injection in the past without much relief. His secondary diagnoses were neck pain and upper extremity radicular symptoms with finger and left hand weakness. Dr. Grier noted the plaintiff also had

significant pain in his left shoulder. Dr. Grier noted that the plaintiff's "pain significantly limits his ability to perform his activities of daily living" (Tr. 264-65).

On September 23, 2008, Dr. Worsham treated the plaintiff for an upper respiratory infection and increased his dosage of Valium based on the plaintiff's reports of increased anxiety (Tr. 292).

On September 26, 2008, Dr. Grier noted that the plaintiff's medications included Robaxin and Oxycodone, and that the plaintiff reported no side effects. He also noted that the plaintiff's MRI showed multilevel disc bulging but no obvious nerve root impingement (Tr. 263). Dr. Grier ordered nerve conduction studies, the results of which were reported as normal (Tr. 260-63).

Dale Van Slooten, M.D., a state agency medical consultant, reviewed the plaintiff's records in December 2008 and concluded that he could lift ten pounds occasionally and frequently, sit for six hours and stand/walk for two hours in an eight-hour workday, had limited ability to use foot controls, and could occasionally balance, stoop, kneel, crouch, and crawl (Tr. 300-07). State agency medical consultant William B. Hopkins, M.D., reported essentially the same findings in September 2009 (Tr. 337-44).

In January 2009, Robbie Ronin, a state agency psychological consultant, reviewed the plaintiff's records and found he did not have a "severe"[2] mental impairment (Tr. 308-21).

In December 2008 and April 2009, Dr. Worsham refilled the plaintiff's medications for anxiety (Tr. 330-31). In January and March 2009, Dr. Grier noted that the plaintiff was stable on his medications but still had significant pain (Tr. 326-27). In May 2009, Dr. Grier indicated he would prescribe a different medication, such as methadone, if Oxycodone was inadequate to relieve the plaintiff's pain (Tr. 325).

---

[2] An impairment or combination of impairments is "severe" if it significantly limits a claimant's ability to do basic work activities. *See* 20 C.F.R. § 404.1521.

10

Xanthia Harkness, Ph.D., a state agency psychological consultant, reviewed the plaintiff's records in September 2009 and found he had depressive and anxiety-related disorders that resulted in mild limitations in activities of daily living, moderate limitations in social functioning and concentration/persistence/pace, and no episodes of decompensation (Tr. 345-55). In a mental residual functional capacity ("RFC") assessment, Dr. Harkness indicated that the plaintiff had no significant limitations in most areas of work-related mental functioning and moderate limitations in the following areas: understanding, remembering, and carrying out detailed instructions; maintaining concentration and attention for extended periods; and interacting appropriately with the general public. Dr. Harkness concluded that the plaintiff was able to perform simple, repetitive work that did not involve ongoing interaction with the general public (Tr. 359-61).

On September 4, 2009, the plaintiff reported he was walking more, which sometimes exacerbated his pain. Dr. Grier noted that the plaintiff was relatively stable on his medications and that while his pain was not completely relieved, his medications were quite helpful (Tr. 369). In December 2009, the plaintiff complained of increased pain after he had "a lot of physical activity associated with work around the house and some malfunction of his vehicle" (Tr. 368). In January, March, and July 2010, Dr. Grier noted that the plaintiff was relatively stable and continued his medications (Tr. 364).

Brian A. Keith, Ph.D., a psychologist, examined the plaintiff at the request of the Commissioner on September 8, 2009. The plaintiff reported that his daily activities included feeding his dog, getting his mail at the post office, watching television, preparing some meals, doing laundry, and paying bills. He stated that he was unable to meet his hygiene needs without assistance. The plaintiff was oriented, had intact thought processes, had somatic thought content, and grossly intact memory for both recent and remote events. The plaintiff could recite the days of the week and months of the year in reverse order, mentally calculate arithmetic, and spell the word "world" forward and backward (Tr. 334).

11

Dr. Keith diagnosed depression vs. pain disorder with depression. He found the plaintiff had average cognitive skills and intact social functioning. Dr. Keith opined that "[c]ognitive skills appear sufficient for engaging in complex task, multi step activities, and following fairly detailed directions. However, he reports he is in ongoing pain and this may make it difficult for him to concentrate and engage in a sufficient pace throughout the course of a work day. He does take medications to address his pain" (Tr. 332-36).

C. David Tollison, Ph.D., evaluated the plaintiff on August 9, 2010. The plaintiff was oriented, had intact thought processes, had somatic thought content, and grossly intact memory for both recent and remote events. The plaintiff could recite the days of the week and months of the year in reverse order, mentally calculate arithmetic, and spell the word "world" forward and backward. Dr. Tollison diagnosed major depressive disorder, lower back and lower extremity pain, and a Global Assessment of Functioning ("GAF") score of 50.[3] He concluded that the plaintiff would have difficulty maintaining attention and concentration, would require frequent unscheduled rest periods, and would not be able to meet typical production or attendance standards due to increased pain with physical activity (Tr. 374-78).

Randy L. Adams, M.Ed., a vocational evaluator, examined the plaintiff on August 17, 2010 (Tr. 184-93). Mr. Adams concluded that the plaintiff was limited to sedentary work with limitations on use of his left upper extremity, but could not perform clerical or sales work because of his marginal education. He stated that the plaintiff's limitations in handling, fingering, and reaching would seriously erode the occupational base

---

[3] A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." See Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (Text Revision 4th ed. 2000) ("*DSM-IV*"). A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well. *Id.* A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* A GAF schore between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. *Id.*

of sedentary work (Tr. 191-92). Mr. Adams stated that the plaintiff's chronic pain and symptoms of depression and anxiety, along with his physical limitations, would preclude him from performing any substantial gainful activity (Tr. 192-93).

On August 31, 2010, Dr. Grier noted the plaintiff was stable on his current medications and noted there were no side effects from the medication. The plaintiff had "a little bit of transfer difficulty and a slow and deliberate gait, but no particular limp on one side or the other when he walks" (Tr. 620). On October 25, 2010, the plaintiff had "a lot of transfer difficulty and a little bit of difficulty gaining his balance when he stands up from the seated position." Dr. Grier also noted that fine motor movement was difficult in both hands, but primarily the left. Dr. Grier noted the plaintiff was taking "Flexeril one at bedtime for spasm and insomnia." Dr. Grier also reported, "He has a lot of problem with insomnia despite taking medications in the past including Zanaflex, which was oversedating. Lunesta was also oversedating. He takes Paxil currently for depression, but he can only take a quarter of a tablet because of the sedating side effects. He uses Valium at bedtime, which is somewhat helpful" (Tr. 617). On December 20, 2010, the plaintiff had a "fair amount of transfer difficulty" and was stable on his medications (Tr. 616).

On January 17, 2011, Dr. Tollison completed a Psychiatric Review Technique form, in which he indicated that the plaintiff met the listings for affective and somatoform disorders (Tr. 216-29), and a medical source statement, in which he indicated that the plaintiff could "rarely" deal with the public, function independently, maintain attention/concentration, demonstrate reliability, and relate predictably in social situations, and "never" deal with work-related stress (Tr. 231-32). Dr. Tollison also indicated that the plaintiff had those limitations since July 19, 2006 (Tr. 234).

On February 24, 2011, Dr. Worsham completed a questionnaire indicating that the plaintiff was unable to work due to chronic pain (Tr. 240-41). He further stated that the work limitations were supported by his diagnoses and findings of: multilevel

13

degenerative disc disease, cervical and lumbar, chronic pain with movement, pain and stiffness when sedentary, generalized anxiety disorder with severe depression, and hyperlipidemia (Tr. 240-41).

On April 11, 2011, Dr. Grier examined the plaintiff and noted decreased range of motion in all axes, extremities had good strength and tone without new focal motor or sensory deficits, distal pulses palpable throughout, and deep tendon reflexes symmetric and nonpathologic throughout. The plaintiff was alert and oriented with intact memory and no major signs of depression, anxiety, or psychosis (Tr. 614).

On April 18, 2011, Carol Burnette, M.D., examined the plaintiff on referral by Dr. Grier for an impairment evaluation in relation to the work injury that occurred on July 19, 2006.  Dr. Burnette indicated that the plaintiff's cervical spine MRI showed facet joint hypertrophy at C6-7 but no other significant abnormalities. Nerve conduction studies did not confirm radiculopathy.  Lumbar spine examination revealed mild tenderness with no lower extremity atrophy. Dr. Burnette indicated that hip x-rays revealed only minor degenerative disease. Dr. Burnette also indicated that lumbar MRI showed multiple levels of disc bulging, facet naturopathy, and varying degrees of lateral stenosis.  Dr. Burnette assigned a 9% whole person impairment, equivalent to 12% lumbar spine impairment.  Dr. Burnette opined that, based on the plaintiff's ongoing pain and narcotic pain medications, the plaintiff was "unable to maintain gainful employment in any capacity" (Tr. 611-13).

On June 8, 2011, Dr. Grier noted that the plaintiff had a "fair amount of transfer difficulty arising from the seated position to an upright posture" and mental status was normal. Dr. Grier noted that the plaintiff used "Flexeril 10 mg up to 3 times a day for spasm and insomnia" (Tr. 610).

The plaintiff underwent right lumbar facet joint injections by Dr. Grier on July 23, 2012 (Tr. 601).  On August 20, 2012, Dr. Grier noted "marked improvement in his back pain since the injections" and further noted that the plaintiff had decided to to stop all

14

narcotics, which he had done for 10-14 days. Dr. Grier noted the plaintiff had "some difficulty sleeping but overall stable to improved" and started the plaintiff on a prescription of "clonidine 0.1 mg Q HS for pain and insomnia" (Tr. 600).

On May 22, 2013, Dr. Grier completed a Clinical Assessment of Pain, noting the plaintiff experiences pain to such an extent as to be distracting to adequate performance of daily activities or work. Dr. Grier reported that the plaintiff's pain would cause a moderate to moderately severe interference with his ability to maintain concentration throughout an eight-hour workday. Further, pain would interfere with his ability to stay on task for two consecutive hours without taking an unscheduled break, would require the plaintiff to exceed the number of usual breaks during an eight-hour workday, and would interfere with the completion of an eight-hour workday. Dr. Grier also reported that the plaintiff would possibly miss more than three days of work per month due to pain related absences (Tr. 621-23).

### Administrative Hearing - August 23, 2010

The plaintiff testified that he experienced pain in his back, right hip, and right leg, severe muscle spasms in his right leg, and difficulty reaching with his left arm. He said that he could no longer play the guitar and that he tended to drop things a lot due to arthritis in his fingers (Tr. 40-41). He said that he was bedridden for nine months following his accident and that he had a lot of depression (Tr. 43). He testified that he did not follow Dr. McMillon's recommendation for surgery because Dr. Grier advised against it. The plaintiff testified that he could sit for about 20 minutes, stand for about 10-15 minutes, and walk for about 5-10 minutes. He testified that he lay down about 20 minutes out of each hour for pain relief. He testified that he had difficulty balancing and sometimes used a cane. He indicated that his daily activities included feeding his dog, driving short distances, visiting his mother, watching television, reading, and washing clothes. He would go to visit his mother on a daily basis, go to his mother's and sister's for dinner sometimes, would do

15

laundry, he would take his daughter to the park, to the lake or to his brother's house where there was a pool (Tr. 44-54). He testified that he experienced no side effects from medication but that he had "a little" trouble concentrating (Tr. 55).

***Administrative Hearing - May 29, 2013***

The second hearing was conducted nearly two years after the plaintiff's date last insured. The plaintiff's attorney questioned him about his current levels of pain, but not his pain as of his date last insured (June 30, 2011) (Tr. 454-58). The plaintiff testified that he could drive alone (Tr. 467). He was taking no medication for depression (Tr. 475). The plaintiff testified that he was no longer attending church as of a year prior to the hearing (Tr. 481). He could shop weekly for basic necessities and drove to pick up food to eat from a restaurant four times per week (Tr. 482-83). The plaintiff also testified that his pain is so severe that he can no longer entertain his 10 year-old daughter when she visits due to his pain (Tr. 484). The plaintiff testified that he paid someone to wash dishes for him, he used a microwave and did laundry every two weeks, and a friend swept, mopped, and took out the trash for him (Tr. 479-80).

Alfred Jonas, M.D., a psychiatrist, testified as a medical expert. Dr. Jonas testified that the plaintiff's pain was inconsistent with diagnostic tests and physical examinations, which revealed normal EMG and Dr. Grier's notes documenting only at most a modestly antalgic gait (while otherwise being noted as "slight limp" or "essentially normal"), and full cervical spine range of motion with symmetric reflexes and no motor/sensory/neurological deficits (Tr. 427, 470-71; *see* Tr. 263, 265-68, 427, 609-20). Dr. Jonas acknowledged Dr. McMillan's statement that an MRI was consistent with the plaintiff's symptoms (Tr. 467; *see* Tr. 244, 250), but Dr. Jonas stated that "it's not clear . . . from that MRI report that the findings would have been consistent with the symptoms" (Tr. 467). Dr. Jonas testified that, although the plaintiff had a work injury, it appeared that the plaintiff's complaints of pain were "amplified" (Tr. 469). Dr. Jonas further testified that it

16

appeared there were "few meaningful functional impairments within the B criteria" (Tr. 470). Specifically, Dr. Jonas indicated that by the plaintiff's report he was "fully functional with respect to [activities of daily living]" (Tr. 470). Dr. Jonas also indicated that the plaintiff would "theoretically" have "mild to moderate" "possible social impairment" (Tr. 470). Dr. Jonas further testified that, based upon Dr. Keith's note that the plaintiff's cognitive functioning was average and based upon the note that his cognitive functioning was intact during the pain management evaluation, "the indicators are suggestive of not a substantial" impairment in concentration, persistence, and pace (Tr. 471).

The vocational expert testified that a hypothetical individual with the plaintiff's vocational profile who could lift ten pounds occasionally and frequently; stand and walk each two out of eight hours; sit for six out of eight hours; frequently climb; occasionally balance, stoop, kneel, crouch, crawl, and climb ladders/ropes/scaffolds; frequently reach overhead; frequently handle and finger; who needed to avoid even moderate exposure to hazards but could perform simple 1-2 step tasks and have occasional contact with the public could not perform the plaintiff's past relevant work but could perform the representative occupations of packer, assembler, inspector, and surveillance system monitor (Tr. 489-90).

## ANALYSIS

The plaintiff argues that the ALJ erred by (1) failing to find his insomnia was a severe impairment; (2) failing to make an appropriate credibility assessment; (3) improperly rejecting all of the opinions from examining and treating medical sources; (4) relying on the testimony of a medical expert who specializes in psychiatry to dismiss the severity of his pain; and (5) failing to make a proper RFC determination (pl. brief 1-2).

### Insomnia

The plaintiff argues that the ALJ erred in failing to find that his insomnia was a severe impairment (pl. brief 22-25).    A severe impairment is one that "significantly limits

17

[a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Pursuant to SSR 96-03p, "[A]n impairment(s) that is 'not severe' must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities."  1996 WL 374181, at *1.

At step two of the sequential evaluation analysis, the ALJ found the plaintiff's degenerative disc disease of the lumbar and cervical spine (polyarthritis), degenerative joint disease of the hips and right shoulder, depression, anxiety, dysthymic disorder, and somatoform disorder to be severe impairments (Tr. 419-20).    The ALJ specifically considered the plaintiff's allegation that his insomnia was severe impairment, finding as follows:

> I conclude this alleged impairment[] is nonsevere. Claimant in support of his allegation references exhibits 4F, 10F, 16F, and 19F (Exhibit 19E). With the exception of 19F, the remaining exhibits are treatment records from Dr. Worsham none of which contain complaints of insomnia or a diagnosis of insomnia. The records of Dr. Grier and Burnett of Piedmont Pain Management reference a prescription in August for insomnia otherwise there are no other complaints were [sic] diagnosis respect to insomnia (Exhibit 19F).  I find Mr. Brown does not have any work related limitations from insomnia and conclude[] is not a severe impairment.

 (Tr. 420).

The plaintiff argues that the ALJ was "flatly wrong with his assertion of facts regarding the medical evidence of record" (pl. brief 24).    However, the plaintiff's representative's brief (Tr. 579) does indicate these exhibits as support for insomnia as a severe impairment.  Exhibits 4F, 10F, and 16F (Tr. 292-97, 330-31, 370-73) are treatment notes from Dr. Worsham that contain only one reference to insomnia: in October 2007, Dr. Worsham noted that the plaintiff would be continued on his "current regimen of medications for anxiety, hyperlipidemia, insomnia, and pain management" (Tr. 295).  Exhibit 19F (Tr. 592-620) contains treatment notes from Drs. Grier and Burnette, and, as noted by the ALJ,

18

the exhibit references Dr. Grier providing a prescription for clonidine in August 2012 for pain and insomnia and notes that the plaintiff had only "some difficulty sleeping but overall stable to improved" (Tr. 420; *see* Tr. 600). On October 15, 2012, Dr. Grier noted that the plaintiff's insurance carrier would not fill the prescription for clonidine, so the plaintiff paid for it out of pocket. However, because of daytime sedation, the plaintiff stopped taking it (Tr. 597). Dr. Grier made the exact notation at visits in December 2012 (Tr. 594) and February 2013 (Tr. 592). The ALJ did not mention the following treatment notes in Exhibit 19F: on August 31, 2010, Dr. Grier noted that the plaintiff was taking Flexeril at bedtime for spasm and insomnia (Tr. 620); on October 25, 2010, Dr. Grier reported, "He has a lot of problem with insomnia despite taking medications in the past including Zanaflex, which was oversedating. Lunesta was also oversedating. He takes Paxil currently for depression, but he can only take a quarter of a tablet because of the sedating side effects. He uses Valium at bedtime, which is somewhat helpful" (Tr. 617); on December 20, 2010, Dr. Grier noted the plaintiff was taking "Flexeril one at bedtime for spasm and insomnia" (Tr. 616); on February 16, 2011, Dr. Grier made the same notation (Tr. 615); and, on June 8, 2011, Dr. Grier noted that the plaintiff "uses Flexeril 10 mg up to 3 times a day for spasm and insomnia" (Tr. 610).

While the ALJ did not mention the additional treatment notes showing the plaintiff's use of medication to help with his insomnia, the ALJ did acknowledge the plaintiff's testimony that he took Flexeril to help with his pain and to help him sleep (Tr. 429). The ALJ also noted that the plaintiff complained in January 2010 to Dr. Grier that Flexeril made him "a little bit drowsy" (Tr. 429; *see* Tr. 367). Accordingly, in the RFC assessment, the ALJ limited the plaintiff to avoidance of moderate exposure to hazards (Tr. 423, 429).

If an ALJ commits error at step two, it is rendered harmless if "the ALJ considers all impairments, whether severe or not, at later steps." *Robinson v. Colvin*, C.A.

No. 4:13–cv–823–DCN, 2014 WL 4954709, at*14 (D.S.C. Sept. 29, 2014) (citing *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008)). *See Washington v. Astrue*, 698 F. Supp. 2d 562, 580 (D.S.C. 2010) (holding that there is "no reversible error where the ALJ does not find an impairment severe at step two provided that he or she considers that impairment in subsequent steps"). Here, the plaintiff has failed to identify any specific functional limitation resulting from this impairment that was not accommodated in the RFC assessment. Accordingly, any error in failing to find the plaintiff's insomnia was a severe impairment was harmless.

Within the insomnia argument, the plaintiff further argues generally that the ALJ failed to consider his impairments in combination (pl. brief 22-24). When, as here, a claimant has more than one impairment, the ALJ must consider the severe and nonsevere impairments in combination in determining the plaintiff's disability. Furthermore, "[a]s a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4ᵗʰ Cir. 1989). It "is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity.... [T]he [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them." *Id.* (citing *Reichenbach v. Heckler*, 808 F.2d 309 (4ᵗʰ Cir.1985)). The ALJ's duty to consider the combined effect of the plaintiff's multiple impairments is not limited to one particular aspect of its review, but is to continue "throughout the disability determination process." 20 C.F.R. § 404.1523.

Here, the ALJ specifically stated that he considered the plaintiff's impairments individually and in combination, and he found that the effects of the plaintiff's physical impairments when considered in combination were more restrictive that when considered individually and thus necessitated a more restrictive RFC finding (Tr. 430). The ALJ

discussed the plaintiff's impairments individually and in combination in making his RFC finding (Tr. 423-39). Accordingly, this allegation of error is also without merit.

***Credibility***

The plaintiff next argues that the ALJ's assessment of his credibility is not based upon substantial evidence (pl. brief 25-29). The undersigned disagrees. The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996). In *Hines v. Barnhart*, 453 F.3d 559 (4th Cir. 2006), a Fourth Circuit Court of Appeals panel held, "Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day." 453 F.3d at 565. However, the court in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available should be obtained and considered.'" *Id.* at 564 (quoting SSR 90-1p, 1990 WL 300812).

The court further acknowledged:

> While objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers."

*Id*. at 565 n.3 (quoting *Craig*, 76 F.3d at 595). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. § 404.1529(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled. However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."); SSR 96-7p, 1996 WL 374186, at *6 ("[T]he absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence.").

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. § 404.1529(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported

by the evidence in the case record." 1996 WL 374186, at *4. Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)     the individual's daily activities;

(2)     the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)     factors that precipitate and aggravate the symptoms;

(4)     the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)     treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)     any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)     any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3.  *See* 20 C.F.R. § 404.1529(c).

In his very thorough decision, the ALJ set out the plaintiff's allegations in detail (Tr. 424-25) and found that while the plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely credible (Tr. 423-27).  Specifically, the ALJ considered the following evidence in finding the plaintiff was not fully credible:

● The plaintiff testified that he could not perform any physical activities, but the record showed that he worked around the

23

house, worked on his vehicle, exercised, and drove to the store to shop and to the post office (Tr. 426; *see* Tr. 296, 368);

●The plaintiff testified that his pain ranges from six to eight out of ten, which is inconsistent with reports of marked improvement in his back pain since receiving facet joint injections (Tr. 426; *see* Tr. 455-57, 594);

● While the plaintiff testified at the first hearing that he had really bad pain in his left shoulder that resulted in an inability to reach above his head, the plaintiff did not make any allegations about his left shoulder at the second hearing. Further, an x-ray of his left shoulder in 2007 was negative (Tr. 426; *see* Tr. 254);

● Dr. Jonas testified there was no objective indication to support the degree of pain alleged by the plaintiff (Tr. 426; *see* Tr. 467-71);

● Dr. Jonas testified that the plaintiff's pain was inconsistent with diagnostic tests and physical examinations, which revealed normal EMG and Dr. Grier's notes documenting only at most a modestly antalgic gait (while otherwise being noted as "slight limp" or "essentially normal"), and full cervical spine range of motion with symmetric reflexes and no motor/sensory/neurological deficits (Tr. 427; *see* Tr. 263, 265-68, 470-71, 609-20);

● Examinations at Piedmont Pain Clinic repeatedly noted no motor or sensory deficits through and after his date last insured (Tr. 426; *see* Tr. 592-610);

● Dr. Burnette indicated that hip x-rays revealed only minor degenerative disease, and an EMG did not conform to radiculopathy (Tr. 426; *see* Tr. 611, 613);

● The plaintiff received conservative pain management from Dr. Grier, who indicated that his condition had stabilized on prescribed medications (Tr. 426; *see* Tr. 581, 592, 594, 597, 600-09);

● Lumbar spine examinations revealed mild tenderness with no lower extremity atrophy (Tr. 427; *see* Tr. 613-14);

● Dr. Burnette indicated in April 2011 that the plaintiff's cervical spine MRI showed facet joint hypertrophy at C6-7 but no other significant abnormalities (Tr. 427; *see* Tr. 611);

24

● The plaintiff's activities of daily living were inconsistent with the severity of pain alleged by the plaintiff and included exercising, walking, cooking, driving, doing laundry, collecting coins, attending church, and shopping (Tr. 421, 427).

As noted by the Commissioner, the ALJ tailored the RFC to account for the plaintiff's credibly established functional limitations (Tr. 419-39).  He specifically limited the plaintiff to performing simple one-two step tasks to account for his pain and use of prescription medication including oxycodone and Flexeril (Tr. 427-28); limited the plaintiff to only frequent (less than constant) fingering and handling to account for his alleged fingering difficulties despite no evidence of focal motor or sensory deficits in his extremities, noting that the plaintiff was able to use a computer and use a checking account and pay bills by writing checks (Tr. 428; *see* Tr. 332, 592-609); accounted for the plaintiff's hip and lumbar pain via the exertional and postural limitations (Tr. 428-29); accounted for the plaintiff's report that his medications made him drowsy by limiting him to jobs that avoided even moderate exposure to hazards even though the plaintiff was able to care for his finances and drove alone (Tr. 429); and accounted for the plaintiff's alleged mental impairments by limiting him to only occasional contact with the public, though noting that he did not report any problems getting along with others (Tr. 430; *see* Tr. 140-42).

The plaintiff argues that the ALJ's interpretation of treatment notes indicating that his condition had "stabilized" was in error (pl. brief 29). The plaintiff notes that being stable means that the pain had not gotten worse rather than meaning the pain was reduced and also notes that Dr. Grier often did not state in the treatment notes that the plaintiff was stable (pl. brief 29).  The type, dosage, effectiveness, and side effects of medication is an appropriate fact for consideration in the assessment of a claimant's credibility.  *See* 20 C.F.R. § 404.1529(c).  Moreover, it is clear from the entirety of the ALJ's opinion that the ALJ did not interpret the plaintiff's stability on medication to mean that he did not suffer from chronic pain, as the ALJ found that the plaintiff retained the ability to perform only a limited

range of sedentary work to accommodate the plaintiff's pain and other limitations (Tr. 427-31).

The plaintiff further argues that the ALJ erred in over-emphasizing "two isolated incidents," crawling under a truck to work on the engine on one occasion (Tr. 296) and "a lot of physical activity associated with work around the house" on another (Tr. 368). However, inconsistencies between a claimant's alleged symptoms and the evidence of record is an appropriate consideration in the evaluation of credibility. *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994). Moreover, as detailed above, it is clear that the ALJ did not base his credibility determination on these incidents alone (Tr. 427).

The plaintiff contends that the ALJ incorrectly found that "inconsistent with the claimant's testimony regarding sitting tolerance of 20 minutes Mr. Brown sat in the hearing from 9:48 until 10:59; standing on one occasion for less than a minute. In addition, the hearing continued from 11:58 until 12:02 with the claimant sitting during both sessions without discomfort" (pl. brief 26 (citing Tr. 429)). At the end of the hearing, the plaintiff's representative noted on the record that he saw the plaintiff stand up three times during the hour-long hearing, and he submitted an affidavit as new evidence stating the same (Tr. 403). It is permissible for the ALJ to consider in the credibility analysis, as one factor out of many, his observations at the hearing. *Massey v. Astrue*, C.A. No. 3:10-2943-TMC, 2012 WL 909617, at *4 (D.S.C. Mar. 16, 2012) ("As to the sit and squirm observations, the ALJ may not solely base a credibility determination on his observations at a hearing; however, the ALJ may include these observations in his credibility determination.") (citations omitted); SSR 96-7p, 1996 WL 374186, at *8 (ALJ may consider personal observations of claimant but may not accept or reject the claimant's complaints solely on the basis of such personal observations). Here, the ALJ considered several factors in making the credibility determination, as set forth above. To the extent that the ALJ may have improperly relied on an inaccurate observation, the error is harmless because the ALJ gave numerous other reasons for his credibility finding that were supported by substantial evidence. *Mickles*, 29

26

F.3d at 921 (finding the ALJ's error harmless where the ALJ would have reached the same result notwithstanding).

Lastly, the plaintiff argues that the ALJ erred in failing to acknowledge that his physical condition deteriorated and he no longer engaged in all of the activities of daily living cited in the credibility assessment (pl. brief 28-29). Specifically, while the plaintiff reported in October 2008 that he "plays the guitar once a week for 30 minutes on Fridays, goes to play gospel Friday nights and goes to church three times a week" (Tr. 431), by the time of the first hearing in August 2010, he testified that he could not even play the slide guitar any more. Further, by September 2009, he no longer attended church (Tr. 333). A review of the ALJ's opinion demonstrates that the ALJ considered the change in the plaintiff's daily activities during the course of the period at issue, noting that the plaintiff testified that he no longer attended church regularly and no longer played the guitar (Tr. 421). Nonetheless, the plaintiff's activities of daily living during the period at issue were appropriate for consideration by the ALJ in evaluating the plaintiff's credibility. *See* 20 C.F.R. § 404.1529(c)(3)(i).

Based upon the foregoing, the undersigned finds that the ALJ's credibility determination is based upon substantial evidence and should be affirmed.[4]

### Medical Opinions

The plaintiff argues that the ALJ erred by improperly rejecting the opinions of his examining and treating medical sources (pl. brief 14-20). The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 404.1527(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5) the consistency of the

---

[4]The plaintiff's argument regarding the ALJ's rejection of Dr. Tollison's opinion will be considered below (*see* pl. brief 27).

27

opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* § 404.1527(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled" or "unable to work" or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 404.1527(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

### Dr. Tollison

Dr. Tollison performed a one-time consultative examination of the plaintiff on August 9, 2010. The plaintiff was oriented, had intact thought processes, had somatic thought content, and grossly intact memory for both recent and remote events. The plaintiff could recite the days of the week and months of the year in reverse order, mentally calculate arithmetic, and spell the word "world" forward and backward. Dr. Tollison diagnosed major depressive disorder, lower back and lower extremity pain, and GAF score of 50, indicating serious symptoms. He concluded that the plaintiff would have difficulty

maintaining attention and concentration, would require frequent unscheduled rest periods, and would not be able to meet typical production or attendance standards due to increased pain with physical activity (Tr. 374-78).  On January 17, 2011, Dr. Tollison completed a Psychiatric Review Technique form, in which he indicated that the plaintiff met the listings for affective and somatoform disorders (Tr. 216-29), and a medical source statement, in which he indicated that the plaintiff could "rarely" deal with the public, function independently, maintain attention/concentration, demonstrate reliability, and relate predictably in social situations, and "never" deal with work-related stress (Tr. 231-32). Dr. Tollison also indicated that the plaintiff had those limitations since July 19, 2006 (Tr. 234).

The ALJ evaluated Dr. Tollison's opinion and discounted it for numerous reasons. First, Dr. Tollison, a one-time examiner, provided no explanation for his statement that the limitations he assessed have been present since July 2006 (Tr. 433). Since Dr. Tollison is not a treating source, he cannot provide a detailed longitudinal picture of the plaintiff's functioning during the relevant period. *See* 20 C.F.R. § 404.1527(d)(2).

Second, the ALJ stated that the two-page "medical source statement (mental)" prepared by Dr. Tollison (Tr. 231-32) was not a statement of mental residual functional capacity as it was the first portion ("Summary Conclusions") of the Social Security Administrations's mental RFC capacity form (Tr. 359-60), which, as the ALJ noted, contains summary conclusions rather than a statement of the claimant's mental functional capacity (Tr. 433). The plaintiff argues that the ALJ erred in this regard as the two forms "are entirely different" (pl. brief 27).  While the undesigned agrees that the two forms are different (*compare* Tr. 231-32 *with* Tr. 359-60), the ALJ's point that the form prepared by Dr. Tollison contained only summary conclusions remains as the form lacks the requisite level of detail to inform the ALJ's opinion.

Third, the ALJ properly noted that the record as a whole—including the plaintiff's longitudinal mental history, activities of daily living, and testimony from Dr.

29

Jonas— persuasively demonstrated that the plaintiff did not have marked mental limitations as Dr. Tollison assessed (Tr. 433). Notably, as the ALJ discussed, Dr. Jonas indicated that the plaintiff was "fully functional with respect to [activities of daily living]"; would "theoretically" have a "mild to moderate" "possible social impairment"; and, based upon Dr. Keith's note that the plaintiff's cognitive functioning was average and the note that the plaintiff's cognitive functioning was intact during the pain management evaluation, "the indicators are suggestive of not a substantial" impairment in concentration, persistence, and pace (Tr. 421-23, 433; *see* Tr. 470-71). Furthermore, the medical evidence, as discussed above, is inconsistent with a conclusion that the plaintiff had any marked mental limitations (Tr. 433). Further, the plaintiff reported that he lived alone, visited with family, drove, prepared simple meals in a microwave, read his Bible, washed laundry, shopped in a store twice per week, played his guitar for a gospel group, went to church multiple times per week for at least an hour each time, and was observed to be able to manage his own finances, provide information about himself, perform serial 7's, and spell world forwards and backwards (Tr. 421-22, 433-34; *see* Tr. 136-42, 334, 364-69, 376).

Fourth, the ALJ properly noted that the plaintiff's longitudinal treatment history was inconsistent with Dr. Tollison's conclusion that the plaintiff would have difficulty maintaining concentration due to pain and depression and would require frequent unscheduled rest periods and would not likely be able to meet typical production standards or regular work attendance due to pain (Tr. 434). Specifically, treating sources repeatedly noted that the plaintiff exhibited no signs of mental symptoms with no mental status examination anomalies or major signs of depression or anxiety during the relevant period and even after his date last insured (Tr. 434; *see* Tr. 263-90, 365-69, 592-620). Furthermore, the plaintiff was able to concentrate to complete the MMPI-II evaluation by Dr. Tollison, which was statistically valid (Tr. 434; *see* Tr. 376).

30

Fifth, the ALJ noted that Dr. Tollison's assessment of marked limitations conflicts with the state agency reviewing psychologists, who did not find that a review of the evidence supported such a finding (Tr. 434; *see* Tr. 308-20, 345-57). The ALJ was required to consider the state agency physician assessments as opinion evidence. *See* 20 C.F.R. § 404.1527(e)(2)(i) ("State agency medical and psychological consultants . . . are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants . . . as opinion evidence, except for the ultimate determination about whether you are disabled."). *See* SSR 96-6p, 1996 WL 374180, at *3 ("In appropriate circumstances, opinions from State agency medical . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources."); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir.1984) ("[T]he testimony of a non-examining, non-treating physician should be discounted and is not substantial evidence when totally contradicted by other evidence in the record. . . . [W]e have also ruled that the testimony of a non-examining physician can be relied upon when it is consistent with the record.") (citations omitted).

Based upon the foregoing, the ALJ properly considered Dr. Tollison's opinions.

### Dr. Worsham

On February 24, 2011, Dr. Worsham completed a questionnaire indicating that the plaintiff was unable to work due to chronic pain (Tr. 240-41). He further stated that the work limitations were supported by his diagnoses and findings of multilevel degenerative disc disease, cervical and lumbar, chronic pain with movement, pain and stiffness when sedentary, generalized anxiety disorder with severe depression, and hyperlipidemia (Tr. 240-41).

31

The ALJ evaluated Dr. Worsham's opinion and ultimately found that it was not entitled to controlling weight (Tr. 434-35). The ALJ acknowledged Dr. Worsham's lengthy treatment relationship with the plaintiff. However, as the ALJ discussed, although Dr. Worsham's treatment notes documented subjective complaints during the relevant period, the notes did not document any corroborating positive musculoskeletal or mental status examination findings, and it appeared that the plaintiff primarily saw Dr. Worsham only for medication refills (Tr. 434; *see* Tr. 292-97, 330-31, 370-73, 434, 589-91). Accordingly, the opinion appeared to be predicated primarily upon the plaintiff's subjective complaints, rather than any objective basis (Tr. 434). Additionally, the ALJ noted that Dr. Worsham's opinion was a pre-prepared form wherein his sole responsibility was to circle answers and list diagnoses (Tr. 240-41). Courts in this circuit have recognized that checkbox forms such as the one at issue here have "limited probative value." *See Freeman v. Colvin*, C.A. No. 7:14cv00199, 2015 WL 5056734, at *4 (W.D. Va. Aug. 26, 2015) (citing *Leonard v. Astrue*, C.A. No. 2:11cv00048, 2012 WL 4404508, at *4 (W.D. Va. Sept. 25, 2012) and *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir.1993) ("Such check-the-box assessments without explanatory comments are not entitled to great weight, even when completed by a treating physician.")). Moreover, Dr. Jonas testified that the plaintiff's MRI imaging was not consistent with the alleged symptoms, an EMG was normal, and the plaintiff had only a modestly antalgic gait (Tr. 427, 435; *see* Tr. 263, 265-68, 470-71, 609-20). While the ALJ noted that neither Dr. Worsham nor Dr. Jonas were specialists in orthopedics, the ALJ found Dr. Jonas' opinion to be more persuasive because he articulated specific evidence, diagnostic testing, and physical examinations to support his conclusions, whereas Dr. Worsham cited none in support of his conclusions (Tr. 435).

Based upon the foregoing, the undersigned finds that the ALJ's decision to give this opinion little weight is based upon substantial evidence and is without legal error.

*Dr. Grier*

On May 22, 2013, Dr. Grier completed a Clinical Assessment of Pain, noting the plaintiff experiences pain to such an extent as to be distracting to adequate performance of daily activities or work. Dr. Grier reported that the plaintiff's pain would cause a moderate to moderately severe interference with his ability to maintain concentration throughout an eight-hour workday. Further, pain would interfere with the plaintiff's ability to stay on task for two consecutive hours without taking an unscheduled break, would require the plaintiff to exceed the number of usual breaks during an eight-hour workday, and would interfere with the completion of an eight-hour workday. Dr. Grier opined that the plaintiff's medications would possibly produce side effects that could be expected to limit the effectiveness of work duties or possibly place severe limitations on the plaintiff's ability to perform even the most simple tasks. Dr. Grier also reported that the plaintiff would possibly miss more than three days of work per month due to pain related absences (Tr. 621-23).

Notably, the opinion was completed nearly two years after the plaintiff's date last insured, and the opinion itself does not indicate that it applies to the period prior to June 30, 2011. The ALJ evaluated Dr. Grier's opinion and gave it limited weight (Tr. 435-36). The ALJ first noted that the opinion was given on a circle-the-answer, conclusory form (Tr. 435). Further, the ALJ noted that the opinion was not consistent with Dr. Grier's own treatment notes and the overall evidence of record. Specifically, the ALJ found that Dr. Grier's opinion was not consistent with the following medical evidence:

- The lower extremity nerve conduction study was entirely normal (Tr. 260);

- MRI imaging revealed no definite neural compressive lesions (Tr. 263);

- Records revealed no atrophy, motor weakness, or loss of sensation apart from a little less sensitivity on the sole of the right foot, and Dr. Grier's examinations revealed some

33

weakness on the right side that seemed to be resolving, stable mental status, and neurologic memory intact with no signs of depression/anxiety/psychosis, with no medication side effects (Tr. 263-66, 272-90, 325-28, 364-69, 592-620);

● At the first administrative hearing, the plaintiff testified that he did not have any side effects "that [he] kn[e]w of" from his medication (Tr. 55);

● The plaintiff demonstrated an ability to concentrate taking the MMPI-II evaluation (Tr. 376); and

●The plaintiff's condition was noted to have stabilized and he reported "marked" improvement in his back pain after epidural injections, had little difficulty getting up from a sitting position, and ambulated independently (Tr. 581, 592-98, 600-10).

(Tr. 435-36).

The undersigned finds that the ALJ did not err in his consideration of this treating physician's opinion and gave specific reasons supported by substantial evidence for the weight given to the opinion.

### Dr. Keith

Dr. Keith, a psychologist, evaluated the plaintiff at the request of the Commissioner on September 8, 2009. The plaintiff was oriented, had intact thought processes, had somatic thought content, and grossly intact memory for both recent and remote events. The plaintiff could recite the days of the week and months of the year in reverse order. mentally calculate arithmetic, and spell the word "world" forward and backward. Dr. Keith found the plaintiff had average cognitive skills and intact social functioning. Dr. Keith opined that "[c]ognitive skills appear sufficient for engaging in complex task, multi step activities, and following fairly detailed directions. However, he reports he is on ongoing pain and this may make it difficult for him to concentrate and engage in a sufficient pace throughout the course of a work day. He does take medications to address his pain" (Tr. 332-36).

In evaluating Dr. Keith's opinion, the ALJ noted that the opinion was the "initial predicate in limiting the [plaintiff] to simple one to two step tasks because of pain" (Tr. 438). With regard to social functioning, the ALJ found the plaintiff to be more limited[5] than Dr. Keith opined based upon "additional evidence and the progressive nature of [the plaintiff's] conditions" (Tr. 438). While the ALJ found that the plaintiff had severe mental impairments, he further found that the evidence, included repeated notes of intact memory and no signs of depression, anxiety, or psychosis, mitigated against Dr. Keith's opinion that the plaintiff could not persist through a full workday. Further, the ALJ noted that Dr. Jonas had the opportunity to review all of the evidence of record, and he gave Dr. Jonas' opinion more weight to the extent Dr. Jonas' opinion was inconsistent with Dr. Keith's opinion. The undersigned finds no error in the ALJ's consideration of this opinion.

### Dr. Burnette

On April 18, 2011, Dr. Burnette examined the plaintiff and opined that, based on the plaintiff's ongoing pain and narcotic pain medications, he was "unable to maintain gainful employment in any capacity" (Tr. 611-13). The ALJ specifically considered Dr. Burnette's statement and found that it was not a medical opinion but rather an administrative finding reserved for the Commissioner's determination (Tr. 436). *See* SSR 96-5p, 1996 WL 374183, at *5. Furthermore, Dr. Burnette's opinion was conclusory and failed to provide any insight into what limitations the plaintiff had because of his impairments. Lastly, the ALJ acknowledged that, based upon her examination of the plaintiff, Dr. Burnette assigned a 9% whole person impairment, equivalent to 12% lumbar spine impairment, for the purposes of establishing a lump sum award for workers' compensation. The ALJ noted that the "percentages used would seem to indicate the

---

[5]In his consideration of the "paragraph B criteria" at steps two and three of the sequential evaluation process, the ALJ found the plaintiff to have moderate difficulties, noting that the evidence showed the plaintiff's social function was more restricted at the present time when compared to his social function at the time of the first hearing (Tr. 422-23).

[plaintiff's] disability is relatively minor," but the ALJ further noted that the percentages did not correlate in any way with the standards required by the Social Security Administration in establishing disability (Tr. 436). Based upon the foregoing, the undersigned finds no error in the ALJ's consideration of this opinion.

### *Mr. Adams*

Mr. Adams, a vocational evaluator, examined the plaintiff on August 17, 2010, and concluded as follows: "Taking into consideration the combination of exertional and non-exertional impairments including the psychological aspects of this gentleman's disability as well as his physical disability in combination with his academic limitations and tested aptitudes, it is my vocational opinion that Mr. Brown is not able to obtain or maintain any substantial gainful activity as it may be found in the local, state or national economy" (Tr. 193). Based upon Mr. Adams' testing of the plaintiff, he found that the plaintiff was functioning in the "marginal range of education" and suffered from moderate stress, severe anxiety, and extremely severe depression (Tr. 188).

Upon remand from this court, the ALJ was directed to evaluate and consider the objective evidence from Mr. Adams' assessment of the plaintiff's ability to perform fine manipulation with his hands and fingers (Tr. 550-52, 517-47, 538-40). Specifically, Mr. Adams' finger dexterity testing (using the Purdue Pegboard test) revealed the plaintiff had "very low" hand and finger dexterity in both hands and was not a candidate for any type of job that would require him to use his hands and fingers on a repetitive basis and manipulating small parts (Tr. 188).

The ALJ considered Mr. Adams' opinion that the plaintiff would be unable to perform even less than sedentary work due to subjective pain, side effects of medications, physical limitations, and psychological issues (Tr. 437; *see* Tr. 191-93). The ALJ gave the opinion limited weight (Tr. 437-38). First, the ALJ noted that the objective evidence did not document any debilitating side effects from medication; in fact, at nearly every visit, treating

36

sources documented no side effects from medication (Tr. 437; *see* Tr. 263-66, 272-90, 325-28, 364-69, 592-620). The ALJ noted that this "significant variance from Mr. Adams' predicate for his opinion seriously erodes the validity of his opinion" (Tr. 437). *See* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion."). Second, the ALJ noted that while the record supported a finding of depression and anxiety, the severity revealed by the medical evidence was significantly different than that found by Mr. Adams (Tr. 437). Specifically, the record reveals that on a majority of treatment visits, the plaintiff had no signs of depression, anxiety, or psychosis and had intact memory (Tr. 188-92, 263-66, 272-90, 325-28, 364-69, 592-620). Moreover, the plaintiff's mental condition had not required hospital admissions or psychiatric treatment. Third, Mr. Adams predicated his opinion on the plaintiff's subjective reports of pain, including "constant" hip pain and increased shoulder pain performing the pegboard, but the plaintiff testified that he had hip pain only four out of seven days, and physical examinations and diagnostic imaging failed to reveal an underlying cause for the pain he reported to Mr. Adams. Further, the plaintiff reported collecting coins, working on a vehicle, working around the house, and using a computer; and motor and sensory examinations revealed no deficits while neurologic exams were repeatedly noted to be intact (Tr. 437-38; *see* Tr. 248-54, 260-90, 292-97, 325-28, 368, 455, 592-620). Fourth, the ALJ found that the objective medical evidence simply did not support the limitations assessed by Mr. Adams, which is discussed more fully in the credibility analysis above.

Based upon the foregoing, the undersigned finds that the ALJ adequately evaluated this opinion and provided reasons for giving it limited weight that are supported by substantial evidence. Furthermore, as will be discussed in more detail below with regard to Mr. Adams' opinion that the plaintiff was not a candidate for any type of job that would require him to use his hands and fingers on a repetitive basis and manipulating small parts

(Tr. 188), even incorporating this additional limitation in the RFC assessment would not ultimately change the outcome of this case.

### Dr. McMillan

The plaintiff argues that the ALJ's failure to mention an evaluation by Dr. McMillan in July 2007 is reversible error (pl. brief 21; pl. reply 4-5). Dr. McMillan examined the plaintiff and found he had an antalgic gait, a positive straight leg raising test on the right, absent ankle reflexes, and abnormal sensation in the right calf. Dr. McMillan diagnosed a far-right lateral disc herniation at L4-5 with right lumbar neuralgia and recommended microdiscectomy surgery and also noted, ""MRI examination documents far right lateral disc herniation and foraminal compression of nerve root L4-5, anatomically appropriate to explain symptoms" (Tr. 244-45).

Initially, it appears from the record that Dr. McMillan evaluated the plaintiff on only one occasion, raising some question about whether Dr. McMillan is a treating physician as the plaintiff claims. *See* 20 C.F.R. § 404.1527(c)(2) ("Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) . . . ."). Furthermore, while the ALJ did not evaluate this opinion, Dr. Jonas acknowledged Dr. McMillan's statement that an MRI was consistent with the plaintiff's symptoms in his testimony at the hearing (Tr. 467; *see* Tr. 244, 250), and found that "it's not clear . . from that MRI report that the findings would have been consistent with the symptoms" (Tr. 467). The ALJ then relied, in part, on Dr. Jonas' testimony in making his findings (Tr. 426-27, 430, 433, 435-36, 439), which, as will be discussed below, was not error. As the medical expert specifically considered the findings from Dr. McMillan's one time examination of the plaintiff, the undersigned finds no reversible error in the ALJ's failure to specifically mention this evidence.

38

***Medical Expert***

The plaintiff argues that the ALJ erred by relying on the testimony of Dr. Jonas, a psychiatrist, with regard to his physical impairments (pl. brief 20-22). However, the ALJ specifically recognized Dr. Jonas' specialty and did not rely solely on this testimony in making his determination that the plaintiff's impairments were not as debilitating as he alleged. The regulations states that "[w]e generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(c)(5). As argued by the Commissioner, it does not follow that a physician should have his testimony rejected outright as to medical issues that are not related to his area of specialty. The ALJ recognized repeatedly that Dr. Jonas was a psychiatrist, but noted that his medical training as an M.D. qualified him to read medical reports (Tr. 426, 435). Moreover, although an ALJ is instructed to select a medical expert "whose expertise is most appropriate to the claimant's diagnosed impairment(s)," it was not error for an ALJ to appoint a medical expert in a given field when a claimant, like the plaintiff here, alleges disability from both physical and mental impairments—that is, an ALJ is not required to appoint a medical expert within the particular medical field of each disability claimed by the claimant. *See, e.g., Kenney v. Comm'r of Soc. Sec.*, 232 F. App'x 183, 187 (3d Cir. 2007) (citing SSA's Hearings, Appeals, and Litigation Law ("HALLEX") Manual, I-2-5-36(D), available at http://ssa.gov/OP_Home/hallex/I-02/I-2-5-36.html); *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001) ("Kepple admits that a medical expert is 'not disqualified from testimony because [his] practice specialty does not lie within the area of medicine reflected by claimant's impairment.'") (citing 20 C.F.R. § 404.1513(a)(1) ("Acceptable medical sources are . . . Licensed physicians")); *Wilkinson v. Colvin*, C.A. No. 12–6180 (ES), 2014 WL 1316056, at *5 (D.N.J. Apr. 1, 2014) (an ALJ may treat the testimony of an internist as expert testimony even though he did not practice in the fields of claimant's impairments

(gynecology, rheumatology, and hematology)); *Cole v. Soc. Sec. Admin.*, C.A. No. 07–CV–5259, 2008 WL 5157919, at *7 (E.D. Pa. Dec. 9, 2008) ("[A] medical expert need not specialize in the field of the alleged disability to testify at the hearing."). As pointed out by the Commissioner, the plaintiff cites no case law for the proposition that a testifying medical expert may not testify outside of his specialty.[6]

Furthermore, as noted by the ALJ (Tr. 439), although the plaintiff's attorney raised an objection at the hearing as to Dr. Jonas' testimony regarding the plaintiff's physical impairments, he did not do so before Dr. Jonas' testimony had ended and he had disconnected his call (Tr. 472-73).    The plaintiff's attorney had ample opportunity to question Dr. Jonas about his qualifications (after stipulating to him as an expert) and asked only if he had previously worked in a pain clinic and what was the definition of somatoform disorder (Tr. 471-72). Additionally, regarding the plaintiff's somatoform disorder, Dr. Jonas, as a psychiatrist, was an appropriate medical expert to testify as to whether the plaintiff's pain had a physical cause and whether his complaints were, as Dr. Jonas characterized them, "amplified" (Tr. 468-72). Based upon the foregoing, the undersigned finds no error in the ALJ's reliance on the testimony of Dr. Jonas in addition to the other evidence discussed herein.

### Residual Functional Capacity

Finally, the plaintiff argues that the ALJ's RFC finding is not supported by substantial evidence because it did not include all of the limitations found by his treating and examining sources.   The ALJ's reasons for discounting the opinions have been reviewed

---

[6]The plaintiff cites *Jones v. Comm'r*, C.A. No. SAG-13-2314, 2014 WL 1877608, at 1 n.2 (D. Md. May 7, 2014), in which the court found the ALJ properly discounted the opinion of a claimant's psychiatrist who prepared an assessment of the claimant's physical limitations (pl. brief 20-21). In *Jones*, the court noted that the ALJ found there was nothing in the record to support the physical limitations assessed by the psychiatrist, the assessment conflicted with the claimant's own testimony, the psychiatrist was not treating the claimant for a physical impairment, and the psychiatrist's credibility as a medical witness was diminished by the fact that she was willing to attest that the claimant was precluded from the limited physical demands of sedentary work based on a bipolar diagnosis. *Id.* The case is not on point to the situation at issue here.

above.  Additionally, the plaintiff argues that the ALJ erred by improperly rejecting the opinion of Mr. Adams regarding the plaintiff's finger dexterity (pl. brief 29-32).

> Social Security Ruling ("SSR") 96-8p provides:
>
> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).  In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.  The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8p, 1996 WL 374184, at *7 (footnote omitted).  Further, "[t]he RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.*  Moreover, "[t]he RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.*

As discussed above, the ALJ thoroughly explained his reasons for rejecting Mr. Adams' assessment.  Moreover, as argued by the Commissioner, even if the ALJ had incorporated additional manipulative limitations in the RFC assessment, the *Dictionary of Occupational Titles* provides that the occupation of surveillance system monitor, which was one of the jobs identified by the vocational expert in response to the ALJ's hypothetical, requires no handling or fingering. DICOT 379.367-010, 1991 WL 673244. A court should affirm the Commissioner's decision, even where there is error, if there is "no question that he would have reached the same result notwithstanding his initial error." *Mickles*, 29 F.3d at 921.  *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.").

41

The regulations provide that if a claimant can perform other work that exists in significant numbers in the national economy, then he is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1560(c).  Based upon the foregoing, this allegation of error is without merit.

### CONCLUSION AND RECOMMENDATION

The Commissioner's decision is based upon substantial evidence and is free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/Kevin F. McDonald
United States Magistrate Judge

January 29, 2016
Greenville, South Carolina

42